## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 16 2019, 8:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennie Scott
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Involuntary Termination of the Parent-Child Relationship of: R.L., Jr. *(Minor Child)*,

and

R.L. *(Father)*

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

December 16, 2019

Court of Appeals Case No.
19A-JT-1626

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

The Honorable Amanda Yonally, Magistrate

Trial Court Cause No.
18C02-1901-JT-1

**Robb, Judge.**

# Case Summary and Issue

[1] R.L., Sr. ("Father") appeals the juvenile court's termination of his parental rights to R.L., Jr. ("Child"). The sole issue Father presents on appeal is whether the juvenile court's termination of his parental rights was clearly erroneous. Concluding the termination of Father's parental rights was not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Father and H.H. ("Mother") are the biological parents of Child, born November 17, 2011. On August 19, 2016, the Department of Child Services ("DCS") received a report regarding Mother's substance and alcohol abuse. At the time, Child was in Mother's care and Father exercised visitation. Approximately one month later, Child was removed from Mother's care and placed with his maternal great-grandmother. On September 29, 2016, DCS filed a petition alleging that Child was a child in need of services ("CHINS") because of Mother and Father's substance abuse issues.[1] Due to concerns that Child's great-grandmother was unable to adequately supervise Child, DCS removed Child from her care on October 20 and placed him in foster care. At

---

[1] Mother's parental rights as to Child were also terminated; however, she does not participate in this appeal. Therefore, we have limited our recitation of the facts to those pertaining to Father except as necessary.

an initial hearing, Father admitted Child was a CHINS and the juvenile court adjudicated Child a CHINS the same day.

[3] The juvenile court held a dispositional hearing and subsequently entered its dispositional decree ordering Father to (among other things): contact the DCS family case manager ("FCM") weekly; obey the law; complete a substance abuse assessment and follow all recommended treatment; submit to random drug screens; attend all scheduled visitations with Child; and participate in Fatherhood Engagement. *See* Exhibit Index, Volume 1 at 19-21.

[4] In early January, Father attended two Fatherhood Engagement meetings. After these meetings, Father never returned to the program nor did he call to reschedule or cancel any appointments. Based on Father's non-compliance, these services were closed out in late February 2017. The next month, DCS referred Father to Meridian Health Services for supervised visitation. Father attended two visitations but was not prepared for either visitation as he failed to bring activities, food, or drinks. Father missed three visits and Meridian removed him from the schedule.

[5] Following a March 2017 periodic case review hearing, the juvenile court found that Father had partially complied with Child's case plan but had failed to maintain contact with DCS and other service providers and had been inconsistent in pursuing services. The juvenile court also found that Father's drug screens had been "inconsistent and positive" and he "continues to struggle

with substance abuse[,]" and he just began engaging in visitation with Child. *Id*. at 23.

[6] Around August or September of 2017, Father re-engaged in supervised visitation with Child but Meridian closed out the services one or two months later due to Father's non-participation. In September 2017, the juvenile court held a hearing on the progress report filed by DCS and found that Father had failed to complete the parent family function assessment, had failed to initiate intensive outpatient drug treatment, and had failed to re-engage in Fatherhood Engagement since services were closed out in February. It also determined that Father had been inconsistent in submitting to random drug screens and in exercising visitation with Child. *See id*. at 26-27. The juvenile court issued an order approving the Child's permanency plan of adoption with a concurrent plan of reunification.

[7] On November 10, 2017, Father was arrested for physically attacking Mother and Child's maternal great-grandmother. The State charged Father with the following: burglary, a Level 1 felony; aggravated battery, a Level 3 felony; domestic battery resulting in serious bodily injury and battery by means of a deadly weapon, both Level 5 felonies; attempted strangulation, a Level 6 felony; criminal trespass and invasion of privacy, both Class A misdemeanors. *See* Exhibit Index, Vol. 2 at 200-05, 208. As a result, on December 14, 2017, the juvenile court issued an order suspending Father's visitation with Child; requiring Father to complete anger management, parenting education,

individual therapy; and obtain a therapist's recommendation for reinstatement of visitation before visitation would be reinstated.

[8] Ultimately, Father was convicted of aggravated battery, battery resulting in serious bodily injury, battery by means of a deadly weapon, attempted strangulation, and invasion of privacy. On May 17, 2018, the trial court sentenced Father to serve over twenty years for his convictions. *See id*. at 206-209. Father's earliest possible release date is February 9, 2026.

[9] At a permanency hearing in September 2018, the juvenile court found that Father had been incarcerated since his arrest in November 2017 and had failed to participate in any services since his arrest. The juvenile court issued an order approving the Child's permanency plan of adoption. DCS filed its Verified Petition for Involuntary Termination of Parent-Child Relationship on January 4, 2019.[2] A court appointed special advocate ("CASA") was appointed for Child. A fact-finding hearing was held on March 21, 2019. Following the hearing, the juvenile court entered an order terminating Father's parental rights and found, in relevant part:

> 21. Father denied having a substance abuse problem.
> However, Father overdosed on two (2) occasions during the
> CHINS case and was admitted to the hospital.

> 22. Father submitted to approximately 49 drug screens, 23 of
> which were positive for illicit substances. Father's last drug

---

[2]DCS filed an amended petition in February 2019.

screen was administered on September 6, 2017 and was positive for THC.

23. Father engaged in minimal visitation with [Child]. Father was inconsistent in attending visitation and was not prepared for visits. Father's interactions with [Child] appeared awkward and forced.

24. Father was ordered to participate in Fatherhood Engagement, which could have assisted Father with parenting skills, understanding childhood development and identifying community resources. Father completed the intake at Children's Bureau in January 2017. Aside from attending two intake appointments, Father did not participate in any additional appointments. Father's referral for Fatherhood Engagement was closed in late February 2017 due to non-engagement.

25. Father completed a substance abuse assessment, which recommended outpatient services. Father did not engage in any substance abuse treatment.

26. Father was referred by DCS to individual and group counseling, but he did not engage in these services.

27. Father was referred by DCS for a parenting assessment, but he did not complete the assessment.

* * *

30. Father has not visited with [Child] since October of 2017. Father has not engaged in any services offered pursuant to the CHINS case since his incarceration[.]

31.    [Family case manager ("FCM") Paxton] Alexander reported that Father did not show an interest in wanting to parent [Child], spoke negatively about [Child], and expressed his desire that [Child] be adopted[.]

32.    Due to his incarceration, Father is unable to care for [Child].

33.    Father has an extensive criminal history. Between 1996 and 2010, Father was convicted of ten (10) separate offenses involving battery, resisting law enforcement, invasion of privacy or residential entry, establishing a pattern of offenses related to crimes against persons.

34.    Father is currently incarcerated as a result of acts of violence committed against [Mother] and [Child]'s great-grandmother.

* * *

42.    Father has failed to participate in or benefit from the services ordered in the Dispositional Decree. Between the initiation of the CHINS case and his incarceration . . ., Father failed to demonstrate sobriety from illicit substances or that he can provide a safe, stable and suitable home for [Child]. Father has not demonstrated that he has engaged in any services or programs while incarcerated.

* * *

44.    Due to his incarceration, Father is in no position to care for [Child]. If Father is released from incarceration on February 9, 2026, [Child] will be more than 14 years old. Whether Father will be released earlier . . . is speculative. It is beyond reason for

[Child] to wait for Father to demonstrate an ability or willingness to meet his needs.

45.     Father's criminal history – both in the number of prior convictions and the nature of the crimes of which he has been convicted, which includes crimes of violence . . . is proof of Father's instability.

* * *

47.     Father has proven himself unwilling or unable to meet his parental responsibilities.

Appealed Order 3-5.  Based on these findings, the juvenile court concluded that there is a reasonable probability that the conditions that led to Child's removal and continued placement outside of Father's care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being.  *See id*. at 4-5, ¶¶ 41, 48.  The juvenile court also concluded that termination of Father's parental rights is in Child's best interests and DCS has a satisfactory plan for Child, namely adoption.  Father now appeals.

# Discussion and Decision

## I.  Standard of Review

We begin, as we often do, by emphasizing that the right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution.  *In re D.D.,* 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.*  The law provides for the termination of these rights when

parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id.* The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

[11]   When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

The juvenile court entered findings of fact and conclusions thereon as required by Indiana Code section 31-35-2-8(c), and we therefore apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

## II. Statutory Framework for Termination

To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires DCS to prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However, because subsection (b)(2)(B) is written in the disjunctive the juvenile court need only find one of the three elements has been proven by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## III. Findings of Fact

Because the judgment underlying the termination of Father's parental rights contains specific findings of fact and conclusions thereon, we must first determine whether the evidence supports the findings. *In re A.S.*, 17 N.E.3d 994, 1002 (Ind. Ct. App. 2014), *trans. denied*. If the record contains no evidence to support the findings either indirectly or by inference, the findings are clearly erroneous. *Id*. Father challenges the following findings of fact:

> 22. Father submitted to approximately 49 drug screens, 23 of which were positive for illicit substances. Father's last drug screen was administered on September 6, 2017 and was positive for THC.

> * * *

42. Father has failed to participate in or benefit from the services ordered in the Dispositional Decree. Between the initiation of the CHINS case and his incarceration . . ., Father failed to demonstrate sobriety from illicit substances or that he can provide a safe, stable and suitable home for [Child]. Father has not demonstrated that he has engaged in any services or programs while incarcerated.

* * *

44. Due to his incarceration, Father is in no position to care for [Child]. If Father is released from incarceration on February 9, 2026, [Child] will be more than 14 years old. Whether Father will be released earlier . . . is speculative. It is beyond reason for [Child] to wait for Father to demonstrate an ability or willingness to meet his needs.

Appealed Order at 3-5.

[15] First, with respect to finding number twenty-two, Father asserts that his last drug screen was not September 6, 2017 but November 9, 2017 and the results were negative. Father is correct. Contained in the record are numerous drug screen results, including the results from Father's most recent, negative drug screen on November 9, 2017. *See* Exhibit Index, Vol. 2 at 154. Therefore, the juvenile court's finding that Father's last drug screen was September 6, 2017 and was positive for THC was clearly erroneous.

[16] With respect to finding forty-two, Father argues that he was unable to participate in services because the FCM failed to set up services while he was incarcerated, and he has been taking classes to earn his GED. Father also

points to the juvenile court's order following a periodic case review hearing on March 19, 2018, in which the juvenile court found that Father submitted to seven drug screens – four of which were negative and three positive for alcohol – prior to his incarceration, as evidence that the juvenile court's finding that he has failed to maintain sobriety is clearly erroneous. Exhibit Index, Vol. 1 at 30. However, we cannot conclude that there is *no* evidence in the record either indirectly or by inference to support the juvenile court's finding.

[17] The record reveals that DCS *did* offer services to Father and he participated in them – albeit "minimally" – but services were eventually closed out due to his non-compliance. Transcript, Volume 2 at 84. Andy Lykens, case manager for the Father Engagement program, testified at the fact-finding hearing that he met with Father twice in January of 2017; however, services were closed out in late February 2017 due to Father's non-compliance. *Id*. at 20-22. Similarly, Shelby Brant, a behavioral clinician with Meridian Health Services, provided supervised visitation for Father and Child. Brant testified that she received the referral in August/September 2017 and worked with Father briefly, but services were closed out one or two months later because Father missed several visits. *Id*. at 36. With respect to the drug screens, the evidence in the record supports the juvenile court's finding that Father failed to demonstrate sobriety. Between September 2016 and November 2017, Father had twenty positive drug screens for illicit substances and three positive drug screens for alcohol. *See* Exhibit Index, Vol. 2 at 103-51, 186.

[18]    In addition, Father challenges the juvenile court's finding that he has failed to participate in any services while incarcerated. Although Father testified that he was taking classes to earn his GED while incarcerated, a reasonable interpretation of the juvenile court's finding is that Father failed to participate in any services related to the dispositional decree. There is no evidence that Father participated in any services pertinent to the dispositional decree, such as parenting classes or substance abuse treatment. Therefore, the juvenile court's finding in this respect is not clearly erroneous.

[19]    Finally, with respect to finding forty-four, Father argues that there is evidence he could be released as early as 2022. However, the only evidence to support Father's assertion was his own self-serving testimony at the fact-finding hearing, which, as DCS asserts, the juvenile court was not obligated to believe as it was the sole judge of his credibility. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) ("As a general rule, factfinders are not required to believe a witness's testimony even when it is uncontradicted."). The juvenile court also acknowledged that any possible release date for Father was mere speculation. Ultimately, Father conceded that he was not capable of caring for Child. Given this evidence and the ample evidence of Father's instability and substance abuse issues as previously described, we cannot conclude there is no evidence to support the juvenile court's finding.

[20]    Finding twenty-two of the termination order was clearly erroneous. Nonetheless, as discussed below, we conclude that DCS presented sufficient evidence to support termination of Father's parental rights and the

unchallenged findings support the juvenile court's judgment. *See In re A.S.*, 17 N.E.3d at 1003-06 (holding that despite several clearly erroneous findings of fact, DCS presented sufficient evidence to support termination of parental rights even absent the erroneous findings).

# IV. Conclusions of Law

## A. Remedy of Conditions

[21] The juvenile court concluded there is a reasonable probability that the conditions resulting in Child's continued placement outside Father's care will not be remedied. Father challenges this conclusion and argues there is no evidence to support this conclusion and there is "no proof" that the conditions were not remedied. Appellant's Brief at 16. We disagree.

[22] We engage in a two-step analysis to determine whether such conditions will be remedied: "First, we must ascertain what conditions led to [Child's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted). With respect to the second step, a juvenile court assesses whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied by judging the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Habitual conduct may include criminal history, drug and alcohol abuse, history

of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence of whether conditions will be remedied. *A.D.S v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change." *In re I.A.,* 903 N.E.2d at 154.

[23] There is no question that Mother's substance abuse issues initially led to Child's removal; however, the conditions resulting in Child's continued placement outside of Father's care is Father's instability stemming from his substance abuse and related problems. There is ample evidence supporting the juvenile court's conclusion that a reasonable probability exists that Father's instability will not be remedied.

[24] First, Father's participation in services was minimal and inconsistent. As part of the dispositional decree, Father was ordered to complete Fatherhood Engagement. In January 2017, case manager Lykens received a referral for Father participation in the program. Lykens and Father had their first meeting on January 5, 2017 to discuss the program. One week later, the two met and Father completed the initial assessment process. Lykens testified that Father was cooperative at that time and he scheduled four more individual meetings; however, Father did not show. In fact, Lykens stated that Father failed to call

to cancel or reschedule the meetings and thus, he closed out services in late February 2017 due to Father's non-compliance.

[25] FCM Alexander[3] testified that she became involved in the case in September 2016 and during the CHINS portion of this case, Father was engaged in services "minimally." Tr., Vol. 2 at 84. She testified that Child could not be placed with Father because he was not consistent with visitation and "also showed zero interest in having [Child] placed with him. It was discussed on quite a few occasions, and [Father] voiced to me on multiple occasions that he wanted [Child] to be adopted by [his current foster parents] and stated that that was the best thing for [Child]." *Id*. at 77. Alexander also stated Father threatened her in June 2017 when she informed him that she and Mother had discussed adoption as the primary goal for Child. As a result, Father became upset that Alexander discussed the issue with Mother. Alexander explained that she was required to speak with Mother because she is a party to the case. However, Father "continued to tell me that he had multiple citations against me that he would take to court, . . . and that I needed to remember who I was talking to, and that he had my name, and I needed to remember that." *Id*. at 78. Believing Father's words were a threat, Alexander told Father he needed to leave her office immediately.

---

[3] The evidence in the record also reveals that Ms. Alexander was previously known as Paxton Kieper, as indicated in numerous exhibits. Tr., Vol. 2 at 60-61.

[26] Regarding visitation, Father initially participated in visitation, but then he became "extremely inconsistent as time went on." *Id.* at 84. Patricia Gaydos, behavioral clinician at Meridian Health Services, received a referral in March 2017 to supervise Father's visitation with Child. Gaydos supervised two visits and testified that Father did not come to either visit prepared for Child. He failed to bring any activities, food, or drinks to the visitation as required. After these visits, Father missed three visits and, per protocol, Gaydos removed him from the schedule. She explained that in order for Father to get back on the schedule, he was required to contact her supervisor. Father re-engaged in supervised visitations in August/September 2017 with Brant, a behavioral clinician at Meridian. Brant only worked with Father for a "month or two" before he missed several visitations in a row and never reached out to reschedule. *Id.* at 35. Therefore, services were closed out in September/October 2017. Father has not participated in any services required by the dispositional decree since his arrest in November 2017.

[27] With respect to Father's substance abuse issues, he completed a substance abuse assessment at Meridian, which recommended outpatient treatment. Alexander submitted a referral for these services, but Father failed to participate in any way. The evidence demonstrates that Father attended a few family and team meetings but also missed several. Alexander recalled one meeting during which Father was present and Mother was late, and "about five minutes after the meeting should have started, he got up and left." *Id.* at 84. Father also completed a court ordered clinical interview and assessment through Meridian

in January 2017, which recommended substance abuse treatment, including individual and group counseling and a parenting assessment. Alexander testified that she submitted a referral for these services and provided Father with the information he needed to complete them. But Father failed to seek the recommended treatment and denied having a substance abuse problem. Alexander stated, "I don't believe [Father] ever believed he had a substance abuse problem. [H]e overdosed twice while I had the case, and was admitted to the hospital twice . . . and he didn't seem to be concerned with that." *Id*. at 85.

[28] The record establishes that Father failed to maintain sobriety. From September 2016 to November 2017, Father had twenty-three positive drug screens for various substances, including THC, amphetamines, methamphetamine, buprenorphine, oxycodone, opiates, heroin, morphine, benzodiazepines, and alcohol. On November 10, 2017, Father was arrested for physically attacking Mother and Child's maternal great-grandmother. At the time of the incident, Father registered a .241 blood alcohol content on a portable breath test. *See* Exhibit Index, Vol. 2 at 196.[4] Father was convicted of multiple felonies and sentenced to the Indiana Department of Correction with an earliest possible release date of February 9, 2026.

[29] The crux of Father's argument is that DCS failed to provide him with services in order to reunify with Child during his incarceration. Specifically, he alleges

---

[4] At the fact-finding hearing, the juvenile court took judicial notice of Father's criminal case, including the probable cause affidavit. Tr., Vol. 2 at 72-75.

that DCS failed to "engage Father in this case at all. [DCS] had already decided that Father should not have custody of the Child or be involved in the Child's life. [DCS] should not be allowed to work cases this way and punish Father in this matter, because [Alexander] believed he threatened her." Appellant's Br. at 19. Alexander testified that Father could have participated in Fatherhood Engagement while incarcerated but she did not try to set that up because Father "had shown no interest in wanting to participate in that service. [H]e had shown no interest in wanting [Child] back at all. He was not interested in reunification. [H]e wanted [Child] to be adopted." Tr., Vol. 2 at 86. She further stated she did not believe Father would have benefited from that service because Father did not want Child. Nonetheless, Father's argument is contrary to our case law:

> The Indiana Supreme Court has long recognized that, in "seeking termination of parental rights," the DCS has no obligation "to plead and prove that services have been offered to the parent to assist in fulfilling parental obligations." *S.E.S. v. Grant Cnty. Dep't of Welfare*, 594 N.E.2d 447, 448 (Ind. 1992). Likewise, we have stated on several occasions that, although "[t]he DCS is generally required to make reasonable efforts to preserve and reunify family *during the CHINS proceedings*," that requirement under our CHINS statutes "is not a requisite element of our parental rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *A.Z. v. Ind. Dep't of Child Servs. (In re H.L.)*, 915 N.E.2d 145, 148 & n. 3 (Ind. Ct. App. 2009) (emphasis added) . . .

*In re J.W., Jr.*, 27 N.E.3d 1185, 1190 (Ind. Ct. App. 2015), *trans. denied*. In fact, this court has held "even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal." *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000). As such, Father's argument that DCS' failure to provide him services while incarcerated somehow negates proof that the conditions will not be remedied offers him no relief.

[30] Finally, we address Father's contention that the only basis for termination of his parental rights was his recent incarceration. We first acknowledge that our supreme court has held that incarceration itself is an insufficient basis for terminating parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1264-66 (Ind. 2009). Father argues his case is similar to *K.E. v. Ind. Dep't of Child Servs.,* 39 N.E.3d 641 (Ind. 2015), in which our supreme court reversed the termination of an incarcerated father's parental rights where he made "substantial efforts toward bettering his life" by participating in numerous programs available to him during his incarceration. *Id.* at 648. Father's situation is distinguishable from the father's in *K.E.* In *K.E.*, the father's release was pending, he had completed twelve programs that were voluntary and did not result in sentence reductions, and he began participating in AA and NA. *Id.* at 648-49. In addition, the father testified that he was sober, prepared to be a good father, would like to receive additional services from DCS upon his release, and stated even if his child is adopted, he hoped to remain in his life as much as possible. *Id.* at 649. Our supreme court held that despite the father's criminal and substance abuse

history, "[g]iven the substantial efforts that [the father] is making to improve his life by learning to become a better parent, . . . it was not proven by clear and convincing evidence that [the father] could not remedy the conditions for [his child's] removal." *Id.*

[31] Here, Father has participated in classes toward earning his GED during his incarceration. Although we commend Father for furthering his education, we cannot conclude that his efforts rise to the level of the substantial effort and improvements made by the father in *K.E.* And as demonstrated above, given Father's pattern of substance abuse problems, non-compliance with services, and lack of commitment to addressing his instability, it is clear that Father's incarceration was *not* the sole basis supporting the termination of his parental rights.

[32] We have often noted that evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services demonstrates the requisite reasonable probability that the conditions will not change. *Lang*, 861 N.E.2d at 372. Such is the case here. In sum, we agree with the juvenile court that the evidence establishes a reasonable probability that the conditions resulting in Child's continued placement outside of Father's care will not be remedied.[5] *See, e.g., In re E.M.*, 4 N.E.3d at 644 (findings regarding a

---

[5] Father also argues the juvenile court erred in finding that the continuation of the parent-child relationship poses a threat to the Child's well-being and argues that DCS failed to prove that Child had been adjudicated a CHINS on two separate occasions. *See* Appellant's Br. at 23-24. However, the juvenile court did not make a

parent's continued non-compliance with services supported juvenile court's conclusion the conditions under which children were removed from the parent's care would not be remedied).

## B. Best Interests

[33] Next, Father challenges the juvenile court's conclusion that termination of his parental rights is in Child's best interests. "Permanency is a central consideration in determining the best interests of a child." *G.Y.*, 904 N.E.2d at 1265. To determine the best interests of the child, the juvenile court must look beyond the factors identified by DCS and to the totality of the evidence. *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004), *trans. denied*. In doing so, the juvenile court must subordinate the interests of the parent to those of the children involved and need not wait until a child is irreversibly harmed before terminating parental rights. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). Recommendations of the FCM and CASA, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interest. *In re A.S.*, 17 N.E.3d at 1005.

---

determination that Child had been adjudicated a CHINS on two separate occasions and therefore, could not have erred in a conclusion it did not make. Furthermore, as noted above, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires only one element be proven to terminate Father's parental rights. *See In re L.S.*, 717 N.E.2d at 209. Having concluded the evidence is sufficient to show a reasonable probability the conditions resulting in the Child's continued placement outside of Father's care will not be remedied, we need not consider whether the parent-child relationship poses a threat to Child's well-being.

Here, FCM Whitney Vance and CASA Tina Yoder both testified that termination of Father's parental rights is in Child's best interests. *See* Tr., Vol. 2 at 94, 97-98. Brant, Child's behavioral clinician, opined that adoption was in Child's best interests. *See id*. at 38-39. In addition, Brant and CASA Yoder both testified that Child wants to be adopted. In discussing the possibility of adoption with Child, Brant stated that Child expressed "joy. He wanted to be adopted." *Id*. at 38. At the fact-finding hearing, Father conceded that he is not able to care for Child and Child's foster parents have "done a great job" taking care of Child. *Id*. at 100. Father also agreed that Child needs a permanent home and believed that permanent home could be with his foster parents. *Id*. at 101. Given this evidence, the trial court did not err in concluding that termination of Father's parental rights is in Child's best interests. *See In re A.S.*, 17 N.E.3d at 1005.

## C. Satisfactory Plan

Finally, Father argues DCS failed to prove that a satisfactory plan for the care and treatment of Child exists. He contends that DCS "did not submit any evidence that placement can provide for all of the needs of [Child] if adopted." Appellant's Br. at 26. A DCS plan is satisfactory when the plan is to attempt to find suitable parents to adopt the children. *In re A.S.*, 17 N.E.3d at 1007. We will not find a plan unsatisfactory simply because DCS has not yet identified a specific family to adopt the children. *Id*. There need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *Id*. Similarly, a plan does not need to be detailed, so long as it

offers a general sense of the direction in which the children will be going after the parent-child relationship is terminated. *In re D.D.*, 804 N.E.2d at 268. Here, DCS' plan for Child is termination of parental rights and adoption. *See* Appellant's Appendix, Volume 2 at 13. Child's current foster mother testified that she and her husband are willing and able to adopt Child. Tr., Vol. 2 at 47-48. We conclude that it was satisfactory here that DCS' plan for Child was adoption by his current foster parents.

# Conclusion

[36] We conclude that DCS presented sufficient evidence to support the juvenile court's order terminating Father's parental rights to Child and therefore, the order was not clearly erroneous. Accordingly, we affirm.

[37] Affirmed.

Bradford, J., and Altice, J., concur.